IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

CHARLES SHEPPARD,

Plaintiff,

v.

DR. DANIEL LAVOIE, JOSH KUECKER, ALLEN REYNOLDS, SEAN BAUMGART, GRANT JEFFRIES, MARYAH FREDRICKSON (MARTIN), and DR. LAURA SUKOWATY,[1]

Defendants.

OPINION and ORDER

23-cv-620-wmc

---

Represented by counsel, plaintiff Charles Sheppard claims that he was denied treatment for his diabetic neuropathy and further subjected to unconstitutional conditions of confinement in violation of the Eighth and Fourteenth Amendments while incarcerated at New Lisbon Correctional Institution by the Wisconsin Department of Corrections ("DOC"). For these alleged violations of the Eighth Amendment, as well as related state law claims regarding his medical treatment, Sheppard has named as defendants: Dr. Daniel LaVoie, the Medical Director of DOC's Bureau of Health Services; Dr. Laura Sukowaty, the Assistant Medical Director; and Nurse Clinician Maryah Fredrickson. As for his conditions of confinement claims, he has named four correctional officers as defendants: Josh Kuecker; Allen Reynolds;

---

[1] Plaintiff was also granted leave to proceed on Eighth Amendment claims against defendants Mark Ledesma, Gina Buono and Matthew Wright, but he dismissed his claims against those defendants before summary judgment. (Dkt. #59.) He was also granted leave to proceed with claims that security staff failed to assist him when he was having seizures, but he abandoned those claims at summary judgment by failing to respond to any proposed facts or arguments raised by defendants about those claims. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument ... results in waiver," and "silence leaves us to conclude" a concession).

Sean Baumgart; and Grant Jeffries. Before the court is defendants' motion for summary judgment. (Dkt. #30.) For the reasons below, defendants' motion will be granted.

## UNDISPUTED FACTS[2]

### A. Background

In May 2023, while incarcerated at New Lisbon Correctional Institution ("NLCI"), plaintiff Charles Sheppard was treated by the Health Services Unit ("HSU") for a variety of medical conditions, including Type 2 diabetes, diabetic polyneuropathy, focal seizures, hypertension, and chronic pain.[3] To treat these conditions, Sheppard was prescribed a variety of medications including pregabalin for his diabetic neuropathy and associated pain; Keppra for his focal seizures; insulin for his diabetes; and lisinopril for his high blood pressure.

Pregabalin is a gabapentinoid medication, a controlled substance that can create a high similar to valium if snorted. For this reasons, pregabalin can be problematic when prescribed in a correctional setting due to the potential for abuse and diversion; indeed, inmates commonly sell or are extorted for gabapentinoids. Pregabalin also presents heightened risks when combined with opioids or used by patients with substance-abuse concerns because it can exacerbate drug-induced respiratory depression, resulting in a higher risk of death.

[2] Unless otherwise indicated, the following facts are drawn from the parties' proposed findings of fact and responses, as well as the record where appropriate.

[3] Diabetic neuropathy is a complication of diabetes caused primarily by chronic high blood sugar levels, damaging the nerve's ability to send signals over time. The condition can also cause numbness, pain, sensitivity to touch, muscle weakness and unusual sensations such as tingling, burning or prickling. Focal seizures, also called "partial seizures," are a neurological disorder characterized by recurring seizures that originate in or affect only one hemisphere of the brain.

As a result, particularly in prison, pregabalin and other gabapentinoids are considered "last resort" prescriptions, which should only be prescribed if first-line treatments have failed. In the case of neuropathy, first-line treatments include amitriptyline and duloxetine, Tylenol, and NSAIDs. Further, DOC advanced care providers must obtain authorization from DOC's Bureau of Health Services ("BHS") before prescribing pregabalin to an inmate. To obtain permission, advanced care providers submit a special non-formulary request form called a "gabapentinoid request," which is reviewed on a case-by-case basis by BHS's Medical Director or Assistant Medical Director.

**B. Sheppard's Inconsistent Use of Pregabalin**

To obtain his prescription for twice-daily pregabalin for his diabetic neuropathy, in September 2022, Sheppard was required to sign a "Chronic Pain Management Agreement" *and* submit to lab work to evaluate the amount of pregabalin in his blood before each dose. The purpose of this lab work was to ensure that Sheppard was taking pregabalin as prescribed.

Specifically, immediately before a dose, an inmate's pregabalin blood level should be low but not unmeasurable, as that would suggest the inmate was not taking the medication as prescribed. There are other reasons that a draw might show an unexpectedly low level, such as the timing of the draw or medication changes. For Sheppard, his lab work was expected to show a level of pregabalin between 2 and 10 ug/mL. However, in November 2022, his pregabalin level was higher than expected -- 17.6 ug/mL.

In February 2023, Sheppard refused several doses of pregabalin on the grounds that it was not working for him, and blood testing had been showing very inconsistent levels of the medication for several months. Nonetheless, Sheppard reported to Nurse Practitioner Wendy

Mohr that he had stopped taking medication for his focal seizures because he was using his pregabalin to treat his seizures instead. Then, on February 18, due to his inconsistency in taking his medication, Nurse Mohr decided to stop Sheppard's pregabalin prescription for noncompliance. She also noted that pregabalin should *not* be used to treat Sheppard's seizure activity; rather, he needed to take his seizure medication -- carbamazepine. Finally, Mohr instructed Sheppard to return to HSU if he had new or worsening symptoms.

A few days later, on February 28, Sheppard notified HSU that he was having withdrawal symptoms from the discontinuation of his pregabalin. He then met with Nurse Mohr, who reiterated why the medication had been discontinued and the importance of medication adherence. Sheppard again signed a Chronic Pain Management Agreement, under which he agreed to cooperate with guidelines regarding medication management, including to follow his pregabalin regimen as prescribed. To ensure that the medication was properly taken, Sheppard's pregabalin would also be crushed into a powder form and mixed into water.

Despite agreeing to comply with his pregabalin regimen, however, Sheppard refused to take pregabalin on March 12, 15, 17, 18, 19, 21 and 23. On March 24, he was brought to the HSU again to discuss with Nurse Mohr this noncompliance. At that time, Sheppard explained he had refused the pregabalin because it upset his stomach. Mohr responded that HSU would continue to monitor dose compliance for pregabalin over the next several weeks. On April 2, 8 and 10, Sheppard again refused his pregabalin, stating he would not take the medication if health staff continued to use the "crush and float" method to administer it.

On April 11, 2023, Sheppard met with Mohr once more in HSU to discuss his noncompliance with his most recent Chronic Pain Management Agreement. Since that date, Sheppard had signed multiple refusal forms for pregabalin, stating that it upset his stomach.

Nurse Mohr reiterated the importance of Sheppard complying with the agreement and his medication regimen. She also advised that HSU would continue to monitor his medication compliance over the following weeks. Nonetheless, Sheppard continued to refuse his pregabalin prescription, objecting to the "crush and float" method of delivery.

### C. **Sheppard's Positive Drug Tests and the Discontinuation of His Pregabalin**

On May 16, 2023, Sheppard arrived at HSU at 6:50 a.m. for routine lab work with a pregabalin level of 1.1 ug/mL. Sheppard was also selected for a random drug screening as permitted under his Chronic Pain Management Agreement. After being asked to provide a urine sample, Sheppard told the nurse that he had been drinking "gallons" of water all night and had just urinated, but that he could provide a sample. After Sheppard returned the sample cup, however, the nurse noted that it appeared to be water, as it was clear with a scent of chlorine. A dip sample was then performed, which confirmed that the sample was water. The nurse immediately contacted the on-call physician, Dr. Ledesma, who recommended that the nurse obtain a second sample using a security drug screening cup, which would monitor the sample for temperature, pH, and specific gravity. The nurse coordinated with security staff to conduct a second sample collection at about 9:30 a.m. Sheppard provided 10 mL of urine, which did not meet the minimum urine sample amount required for security testing; so instead, the sample was poured into an HSU test cup. HSU staff then tested the sample, which was positive for buprenorphine (a synthetic opioid) and cocaine.

At that point, HSU staff again contacted Dr. Ledesma to provide an update about the results of the drug screening. After reviewing Sheppard's medical record, including his inconsistent pregabalin serum levels and medication refusal, Dr. Ledesma ordered that

Sheppard's pregabalin prescription be discontinued, offering acetaminophen instead. In particular, Dr. Ledesma noted his concern that mixing a gabapentinoid with buprenorphine and cocaine was dangerous and could lead to an overdose or respiratory depression. Ledesma further did not think that tapering Sheppard's pregabalin was necessary or appropriate in light of Sheppard's low therapeutic serum level of pregabalin that same day (1.1 ug/mL), particularly given the risk of receiving pregabalin with his positive drug tests.

Two days later, on May 18, security staff conducted a second urinalysis of Sheppard. When that test was also positive for cocaine and buprenorphine, security staff contacted HSU to see if any of Sheppard's prescription medications could have altered or caused a positive result for cocaine and buprenorphine. After HSU staff verified that Sheppard was not prescribed any medication that would explain a positive result for cocaine or buprenorphine, he was issued a conduct report and later found guilty, for which Sheppard received 120 days of disciplinary separation.

On June 7, 2023, Sheppard's urine sample was tested by an outside laboratory at his own expense. The results of that testing were negative for cocaine and buprenorphine, but positive for hydroxybupropion -- a different medication for which Sheppard did not have a prescription. Sheppard's initial conduct report was then rescinded, although a new conduct report was issued charging him with use of intoxicants based on the hydroxybupropion result. Sheppard's 120-day disciplinary separation punishment remained the same.

**D. Sheppard's Medical Care and Conditions of Confinement in RHU**

Meanwhile, Sheppard had been moved to the Restrictive Housing Unit ("RHU"). Then, between May 17 and May 22, 2023, he refused to take 65 doses of his prescribed

medications, including anti-seizure medication and insulin for his diabetes. Instead, during that time period, Sheppard only took one dose of Metformin (on May 21) and two doses of ibuprofen (May 18 and May 21). On May 18, at about 5:00 p.m., Sheppard also reported experiencing a seizure and losing consciousness while in his cell.

The following day, May 19, 2023, Sheppard reported that his knees had buckled and that he was having difficulty walking due to neuropathy. A nurse from HSU came to assess him, noting that he had some fluid build-up on the top of his skull, but no change in color of the skin and no bleeding. Sheppard's blood sugar level was also 333 mg/dL, which was dangerously high, but he had been refusing insulin, as well as Keppra for his seizures. His only request was to restart pregabalin.

The next day, May 22, Sheppard wrote to HSU that he intended to go on a "medication and insulin strike." Apart from one dose of ibuprofen, Sheppard had been refusing blood sugar checks and medications. He also reported seizure activity but refused to be assessed by HSU staff. HSU staff placed Sheppard on medical supervision, meaning that he would be continually monitored in an observation cell. That same day, Officer Kuecker assisted in transferring Sheppard to Cell 35, the observation cell in RHU. This cell was most often used as a "dry cell" for inmate drug testing purposes, meaning that the water was usually turned off in that cell. Unbeknownst to Kuecker or security staff, however, the water had not been turned on in Cell 35 before Sheppard was transferred into it. Later that morning, Sheppard again refused his medication. As a result, Kuecker again was unaware the water had been turned off for Sheppard's use. Finally, on the evening of May 22, Sheppard wrote to HSU, advising that the water in his cell was not working.

After reviewing that note the following morning, May 23, HSU staff contacted security staff to investigate. Sergeant Trankle arrived at Sheppard's cell around 6:30 a.m. and asked him to test the water. At that time, Trankle observed that the sink worked, although the toilet did not. Trankle then spoke with Sergeant Allen Reynolds and Officer Sean Baumgart about the issue. They both responded that Sheppard had been placed in Cell 35 the day before and had not reported any issue with the water in his cell. Sergeant Reynolds then instructed Officer Kuecker to resolve the water issue, which he did. At around 12:00 p.m., Officer Baumgart notified Sergeant Trankle that the water issue was resolved.[4]

The next day, May 24, at about 2:30 p.m., Nurse Maryah Fredrickson visited Sheppard at Cell 35. While expressing a desire to be moved back into a non-observation cell, Sheppard reported no medical concerns. Less than an hour later, however, Nurse Fredrickson was called back to RHU to respond to Sheppard's complaints of a headache, which he advised Fredrickson was a precursor to his seizures. Fredrickson noted that Sheppard had not been taking his medications as directed and educated him about auras as a sign of an impending seizure. She also instructed him to report auras to staff so they could help provide for his safety.

A week later, on May 31, 2023, Nurse Fredrickson saw Sheppard again for a Sick Call following a possible seizure earlier that morning. Sheppard reported that he had experienced a seizure while laying down in his cell and that he had back pain. However, he had no physical signs of injury and denied experiencing any aura beforehand. Nurse Fredrickson also observed Sheppard leaning forward, sitting back, and twisting his upper body in his chair. Fredrickson

[4] Plaintiff argues that security staff could have or should have known earlier that the water was turned off in his cell, but cites no evidence to support his assertion. In particular, Shappard does not represent that he reported the lack of water to any security staff before they learned about it from HSU staff on the morning of May 23, 2023.

advised Sheppard that he needed to be testing his glucose regularly, but Sheppard responded that having been diabetic for 20 years, he knew what he needed. Nurse Fredrickson then advised Sheppard that he would be placed back into medical monitoring status to help staff provide for his health and safety, but Sheppard immediately responded that he was going to refuse all medical treatments, including medications. Fredrickson warned that Sheppard was putting himself at risk for injury and death. After Nurse Fredrickson notified an advanced care provider and consulted about ordering blood work to evaluate Sheppard's blood levels of his anti-seizure medication, Keppra, Sheppard was placed back onto medical monitoring status.

The following day, June 1, Sheppard again refused his morning medications, glucose test, medical assessment, and blood work. Sheppard stated that he knew he was placing his health at risk, including for increased seizure activity, medical complications and possible death, but still refused medical care. Nurse Fredrickson entered a non-adherence note into Sheppard's medical records. The next day, June 2, Nurse Fredrickson noted Sheppard was laying on his mattress on the floor, rather than on the hospital bed provided in his cell. Still, Sheppard had no visible sign of injury, made eye contact, and affirmatively stated that he did not need HSU. When Fredrickson returned the next day, June 3, Sheppard was still lying on his mattress on the floor. He also made "good eye contact," had equal hand grips, and his speech was clear when stating that he did not need HSU and reporting no recent seizure activity. The officer on duty that day confirmed Sheppard had not reported any concerns regarding seizures.

On June 4, 2023, Nurse Fredrickson once again visited Sheppard in his cell at RHU following a health service request complaining of pain. At that time, Sheppard was again laying on his mattress on the floor, not on the hospital bed. Nurse Fredrickson asked if Sheppard

needed assistance moving his mattress back on the hospital bed, so he could be closer to the call light, but Sheppard refused. He also refused to have the call light be extended closer to him. Sheppard was able to demonstrate that he could get himself to the toilet using grab bars, but reported that his hands were tingling. Still, he refused any assessment, vitals or glucose check.

Approximately one week later, on June 12, 2023, another nurse attempted to talk to Sheppard about his medications. Despite reporting total loss of sensation in his right hand and stating that he was unable to ambulate with a walker, instead needing to use a wheelchair or crawl on the ground to move, Sheppard continued to protest the discontinuation of pregabalin by refusing his diabetic and antiseizure medications. The next day, Sheppard was sent to an emergency room due to his continued complaints of hand numbness and leg weakness. Specifically, HSU staff requested that he be evaluated for possible stroke, but when Sheppard arrived, he presented paperwork to the emergency room physician claiming that he was supposed to be on pregabalin but had not been receiving it. While the emergency room recommended that Sheppard be prescribed one month of pregabalin, that recommendation was forwarded to Dr. LaVoie, who instead ordered a referral for Sheppard to be seen for an outside pain management consultation to discuss alternative pain medications.

On June 20, 2023, Sheppard was seen by Nurse Practitioner Sara Staff, who was filling in temporarily at NLCI. During the appointment, Sheppard's A1C (a measurement for diabetes) indicated that his average blood sugar over the last three months had been well over recommended levels. Sheppard admitted to eating approximately 3000 calories per day and not paying attention to his carbohydrate intake. NP Staff warned Sheppard that untreated and unregulated diabetes was harmful to his body and that he needed to initiate important

changes if he wanted to get his chronic health diagnoses under control. Sheppard then told Staff that he had been taken off pregabalin after testing positive for cocaine and suboxone, but that his prescription had not been restarted despite confirmation drug testing showing no cocaine or suboxone and the initial conduct report being dismissed. Staff responded by telling Sheppard she would re-prescribe pregabalin because "everyone deserves one free chance with me."

However, at that time, Sheppard had failed to tell NP Staff that: (1) his more recent confirmation testing *was* positive for a different, unauthorized drug (hydroxybupropion); (2) he had received a second conduct report; and (3) his pregabalin prescription had actually been canceled by Dr. Ledesma based on the results of the May, 16, 2023, positive drug test from HSU-initiated testing, not the subsequent testing by security staff. Nevertheless, relying on Sheppard's claims that his previous prescription for pregabalin was discontinued due to an initial positive drug test for cocaine and suboxone, but that confirmation test was negative for both, Staff submitted a non-formulary Drug Request for 25mg pregabalin on June 23 as promised, which was a lower dose than Sheppard had taken previously. That request was forwarded to Dr. LaVoie, who denied it. A few days later, on June 27, Sheppard told RHU staff that he had experienced a seizure at about 1:30 p.m., resulting in him urinating on himself. At that time, an HSU nurse visited Sheppard in his cell, but he refused any medical assessment.

On July 6, 2023, Sheppard was next seen by an HSU physician, Dr. Labby, after requesting to be placed in Do Not Resuscitate (DNR) status. During that appointment, Sheppard complained about his pain management. At that time, he was actively prescribed acetaminophen, ibuprofen and topical creams. After reviewing his history of pregabalin use -- including discontinuations of the medication in 2018 for misuse in 2020 and 2022 after testing

positive for THC, and in 2023, after testing positive for cocaine and suboxone -- Dr. Labby believed that an alpha lipoic acid (ALA) could be a viable option to help reduce Sheppard's diabetic neuropathy. Dr. Labby then ordered that medication but emphasized that the goal of the medication would be to increase his daily function not an absence of pain. Dr. Labby also stressed the importance of controlling his diabetes and addressing his obesity, because those issues were contributing factors to his diabetic neuropathy.

A few days later, on July 11, Sheppard reported to security staff that he'd had a seizure at about 12:15 p.m. during which he defecated in his clothing. While Sheppard did not report any injury, he asked to shower. Although Sheppard did not ask to be seen or assessed by HSU, security staff contacted HSU anyway and spoke with Nurse Fredrickson. The following day, a nurse visited Sheppard for a health assessment and vitals check, which Sheppard refused, stating that he was "good."

On July 15, Nurse Fredrickson again visited Sheppard, who was once more lying on his mattress on the floor. At that time, Sheppard made good eye contact; his speech was clear; and he said he had no concerns to report to HSU. However, the very next day, Sheppard complained to Nurse Fredrickson about wrist pain, while refusing to take any of the pain medications offered. Fredrickson also encouraged him to use his hospital bed instead of the mattress on the floor, so he would have less stress on his body. Nurse Frederickson also told Sheppard that if he did not change his behaviors he could die.

On July 21, Sheppard was again seen by Nurse Practitioner Staff, who noted by that point, Sheppard had been refusing all of his medications for six weeks, except for an occasional dose of Tylenol. NP Staff also observed signs of diabetic ketoacidosis, including sweet ketone breath, profuse sweating and reported weakness. Despite this, Sheppard again refused to have

his glucose levels checked. Instead, Sheppard told Staff that he had a lawyer and would sue her unless she provided him a caretaker to clean his cell and bathe him; assign him to a handicap medical single cell with no cell mate; approve his request for a motorized wheelchair; and prescribe 600mg pregabalin, which was double the highest dose Sheppard had ever been prescribed. Due to Staff's concern for diabetic ketoacidosis, she called for an ambulance so that Sheppard could be taken to the hospital emergency room, but he refused to go. Instead, Sheppard consented to an assessment by an HSU nurse, who forwarded the results of that assessment to the on-call physician. Ultimately, that physician determined Sheppard did not need to go to the emergency room.

On July 27, Nurse Fredrickson visited Sheppard in his cell to conduct a skin assessment checking for sores due to the extensive amount of time he had been spending lying on the floor. Fredrickson saw no skin problems at that time, and Sheppard reported no concerns beyond vomiting blood the previous day. The next day, Sheppard again met with Nurse Fredrickson about his transition back into general population where he would not be able to put his mattress on the floor. Fredrickson asked Sheppard to demonstrate his ability to transfer from a bed to a wheelchair, but he was unable to do so without help. Following this meeting, Nurse Fredrickson notified the HSU Manager that Sheppard may need a higher level of care than what NLCI could provide.

On July 31, 2023, Sheppard met with a physical therapist. Since being taken off pregabalin, Sheppard reported multiple seizures; episodes of incontinence; numbness from his right knee down to his right foot; deficits in ambulation, balance, endurance and strength; muscle spasms and weakness; and 8 out of a possible 10 pain level in his lower back and right hip. Sheppard was also deemed "no longer ambulatory" and demonstrated deconditioning to

the point of unsafe transfers. Based on Sheppard's own reports and demonstrations, therefore, the physical therapist determined that Sheppard needed more intensive physical rehabilitation than what NLCI could provide. After receiving the physical therapist's report, Nurse Fredrickson sent a referral for Sheppard to the Dodge Correctional Institution's (DCI's) Medical Infirmary.

DCI's Medical Infirmary is similar to a skilled nursing facility, with 24-hour nursing, certified nursing assistants, and increased staff to meet the needs of those housed there. The goal of the infirmary is to provide rehabilitation to inmates so that they can be eventually discharged back to their home facility. Nurse Fredrickson told Sheppard about the recommended referral on August 7, asking him to consider it, because she did not think NLCI could meet his needs until he regained strength and conditioning. Fredrickson also encouraged Sheppard to restart his antiseizure medication and regularly check his blood sugar levels, so that his body could focus on rebuilding its strength with physical therapy. Nurse Fredrickson sent a message to Dr. Laura Sukowaty, the Assistant Medical Director of DOC's Bureau of Health Services, detailing her conversation with Sheppard. On August 8, 2023, Sheppard agreed to the transfer to DCI's Infirmary and to participate in physical therapy while there.

**E. Sheppard's Temporary Transfer to DCI's Medical Infirmary**

Sheppard was actually transferred to DCI's Infirmary on August 11, 2023. Upon arrival, Sheppard underwent a medical history screening and physical examination with a nurse practitioner. At that time, Sheppard reported arthritis in his right hip, ongoing pain in his left knee, two seizures per week, and recent weight gain after declining to follow any diet or exercise regimen. Sheppard also agreed to take his prescribed medications and follow recommended

treatments. The nurse practitioner then ordered Sheppard a new prescription for insulin, a foot examination to assess the impact of diabetes, and consultations with neurology and pain services. Sheppard was also placed on dietary restrictions to help re-regulate his diabetes and high cholesterol.

However, the nurse practitioner declined to prescribe pregabalin for Sheppard on the grounds that: he had a recent positive cocaine urinalysis and the combination of pregabalin and cocaine can be fatal; he had engaged in substance abuse and drug seeking behaviors in the past, including by demanding and hoarding bupropion and persuading an emergency room doctor to prescribe pregabalin for him; he'd had multiple suicide attempts, and pregabalin can increase suicidal ideation; he'd failed to comply with his pregabalin treatment plan and pain contract agreements by refusing doses, stopping treatment altogether, complaining about effectiveness, and then demanding reinstatement; and he had refused to engage in his own care, deteriorating to the point he had been demanding pregabalin as the only medication that would help him. (Simmons' Note (dkt. #33-1) 108–09.)

Dr. Sukowaty agreed with NP Simmons' assessment that pregabalin was not a recommended course of treatment for Sheppard. When Dr. Sukowaty advised Sheppard of this, he returned to refusing any further treatment, stating that he would only comply with treatment if he was provided pregabalin. On August 25, 2023, after being at the infirmary for five days, Sheppard was discharged and returned to NLCI.

F. **Post-infirmary care**

On September 7, 2023, Sheppard was again seen by Nurse Practitioner Staff following his return to NLCI. Staff ordered Sheppard an EEG, EMG and physical therapy. She also

submitted a Non-Formulary Drug Request for 300 mg of pregabalin. A Bureau of Health pharmacist responded to the request by stating that pregabalin required a special non-formulary request form called a "gabapentinoid request" that would go directly to Drs. LaVoie or Sukowaty. NP Staff then submitted a gabapentinoid request. This request was received by Associate Medical Director Dr. Gina Buono, who responded by asking for additional information regarding prior medication trials, carpal tunnel severity, possible surgical treatment, and Sheppard's activities of daily living. Staff did not respond to Dr. Buono's request for additional information and the prescription was not approved.

OPINION

Plaintiff claims HSU defendants -- Dr. LaVoie, Dr. Sukowaty and Nurse Fredrickson -- violated his rights under the Eighth Amendment and Wisconsin negligence law by failing to ensure he received pregabalin or an alternative treatment for his diabetic neuropathy. He further claims security staff defendants -- Correctional Officers Josh Kuecker, Allen Reynolds, Sean Baumgart and Grant Jeffries -- violated his rights under the Eighth Amendment by housing him in a cell without running water for 24 hours. Defendants seek summary judgment on all of these claims.

The question on summary judgment is whether there are any genuine factual disputes that could make a difference to the outcome of the case, or stated another way, whether a reasonable jury could find for the nonmoving party, after drawing all reasonable inferences in that party's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 314–15 (7th Cir. 2011); *Montgomery v. American Airlines,*

*Inc.*, 626 F.3d 382, 389 (7th Cir. 2010). The court addresses defendants' claims under this standard below.

**I. Medical Care Claims**

The Eighth Amendment prohibits cruel and unusual punishment. In the medical context, the United States Supreme Court has interpreted that prohibition to include prison staff who are "deliberately indifferent" to a prisoner's "serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976). A "serious medical need" is a condition that a doctor has recognized as needing treatment or one for which the necessity of treatment would be obvious to a lay person. *Johnson v. Snyder*, 444 F.3d 579, 584–85 (7th Cir. 2006). "Deliberate indifference" means that the defendant is aware of an excessive risk to the prisoner's health or safety, but disregards that risk by consciously failing to take steps to help the prisoner. *Forbes v. Edgar,* 112 F.3d 262, 266 (7th Cir. 1997). In the medical context, the plaintiff may prove this element with evidence that the defendant's conduct was "blatantly inappropriate," *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996), or "so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006). In other words, "[a] constitutional violation exists only if no minimally competent professional would have so responded under those circumstances." *Johnson v. Dominguez,* 5 F.4th 818, 825 (7th Cir. 2021) (internal quotations omitted)). Here, defendants do not deny that plaintiff's diabetes, neuropathy, focal seizures and associated symptoms and pain qualified as serious medical needs but argue that the undisputed facts would not allow a reasonable jury to infer that LaVoie, Sukowaty or Fredrickson acted with deliberate indifference to these needs.

Under Wisconsin law, medical negligence is the failure of a medical professional to "exercise that degree of care and skill which is exercised by the average practitioner in the class to which he belongs, acting in the same or similar circumstances." *Sawyer v. Midelfort*, 227 Wis. 2d 124, 149 (1999). Like all negligence claims, a medical negligence claim also requires the following four elements: (1) a breach of (2) a duty owed (3) that results in (4) an injury or injuries, or damages. *Paul v. Skemp*, 2001 WI 42, ¶ 17, 242 Wis. 2d 507, 625 N.W.2d 860. Defendants argue the undisputed evidence also fails to meet the elements of medical negligence.

**A. Dr. LaVoie and Dr. Sukowaty**

On this record, both Dr. LaVoie and Dr. Sukowaty had limited involvement in plaintiff's medical treatment. Nonetheless, plaintiff claims that they acted with deliberate indifference to his serious medical needs and were negligent when: (1) Dr. LaVoie denied Nurse Practitioner Staff's request that plaintiff be prescribed 25mg pregabalin on June 23, 2023; and (2) Dr. Sukowaty approved Nurse Practitioner Simmons' decision not to prescribe pregabalin to plaintiff and to return him to NLCI from DCI's Infirmary after he refused to participate in his prescribed treatment on August 25, 2023. But the court agrees with defendants that no reasonable jury could find either of these actions were "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that" they "actually did not base [their] decision" on the exercise of medical judgment. *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008).

With respect to Dr. LaVoie, it is undisputed that he denied NP Staff's pregabalin request due to legitimate concerns about the safety of a highly abused medication for an

incarcerated patient who had: taken the medication inconsistently in the past; engaged in medication-seeking behaviors; struggled with substance abuse; *and* had a recent conduct report for misusing drugs that could be highly dangerous when combined with pregabalin.[5] Specifically, Dr. LaVoie testified that he denied the request because plaintiff's medical records "clearly indicated" that pregabalin was not an appropriate or safe option to treat his chronic pain and presented an "unacceptable level of risk." (Def's Resp. to Pl's PFOF (dkt. #98) ¶ 59.) Moreover, plaintiff offers *no* contrary medical expert testimony suggesting Dr. LaVoie improperly considered these factors when prescribing gabapentinoids to prisoners nor that his ultimate decision denying pregabalin was unreasonable. In particular, it is not enough to point to NP Staff's request, by itself, as sufficient to prove that Dr. LaVoie was *required* under the Eighth Amendment or even a medical negligence standard to approve plaintiff's request for a pregabalin prescription. *See Pyles v Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) ("Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation."); *Snipes*, 95 F.3d at 592 ("the Constitution is not a medical code that mandates specific medical treatment.").

---

[5] Plaintiff argues that because the outside testing agency did not confirm the presence of cocaine or suboxone in his urinalysis, Dr. LaVoie should not have relied on the urinalysis in denying his pregabalin request. However, it is undisputed that plaintiff's first HSU urinalysis *was* positive for cocaine and suboxone and never retested, as well as that the outside testing agency confirmed a positive test for hydroxybupropion, another medication to which plaintiff had not been prescribed. In short, no reasonable jury could find that the outside testing agency's findings undermined Dr. LaVoie's legitimate reasons for concern as to enabling plaintiff's abuse of an addictive pain reliever like pregabalin, particularly with less addictive alternatives available.

Similarly, plaintiff offers no evidence from which a jury could find Dr. Sukowaty's *agreement* with NP Simmons' thorough, well-reasoned decision to deny plaintiff pregabalin and transfer him back to NLCI to be unreasonable, let alone negligent or evidence of deliberate indifference to a serious risk of harm. On the contrary, like Dr. LaVoie, NP Simmons concluded that pregabalin was inappropriate for a patient who had: a recent positive cocaine urinalysis; engaged in substance abuse and drug seeking behaviors; multiple suicide attempts; failed to comply with his past pregabalin treatment plan and pain contract agreements; and refused to engage in his own care to the point that he had been demanding pregabalin as the *only* medication that could help him. Thus, a reasonable jury would have to find it entirely reasonable for Dr. Sukowaty to accept Simmons' evaluation, especially given plaintiff's history of repeatedly abusing both pregabalin and other drugs.

While plaintiff asserts that when Drs. LaVoie and Sukowaty both denied his request for pregabalin, each left him without treatment for his chronic pain and neuropathy, the record simply and wholly undermines this claim. Specifically, Dr. LaVoie referred plaintiff to be evaluated for additional treatment in June 2023, including alternative pain medication, and Dr. Sukowaty approved plaintiff's transfer to a specialized medical facility. The record also shows plaintiff *was offered but rejected*, numerous other medications to treat his diabetes, seizures, and resulting pain. Indeed, plaintiff continuously refused nearly all medical treatment in protest for not receiving pregabalin. His argument that defendants pursued only ineffective treatment fails when he refused to sincerely try any alternatives to pregabalin or the insulin treatment that could have addressed the cause of his neuropathy.

Finally, an inmate cannot claim that medical providers deliberately ignored him when he refuses all treatment, as plaintiff plainly did repeatedly here. *See Pinkston v. Madry*, 440 F.3d

879, 892 (7th Cir. 2006) (finding no deliberate indifference when inmate refused offered medical care, noting that "the record establishes that if anyone was indifferent to [inmate's] injuries, it was [inmate] himself"); *Walker v. Peters*, 233 F.3d 494, 500 (7th Cir. 2000) (finding no deliberate indifference when inmate refused to take preliminary test before beginning treatment). In short, plaintiff's response raises no disputes of material fact which would preclude summary judgment for Drs. LaVoie and Sukowaty.

**B. Nurse Fredrickson**

For much the same reasons, no reasonable jury could find that Nurse Fredrickson acted with deliberate indifference or negligence to plaintiff's serious medical needs. To begin, as a nurse clinician, Fredrickson was not authorized to prescribe pregabalin; nor did she personally discontinue plaintiff's pregabalin prescription. Instead, her role was to assess plaintiff's condition, provide care within the scope of her authority, and communicate with advanced care providers with that authority as necessary. The record shows that Fredrickson did just that by performing all of these duties adequately in her treatment of plaintiff. Specifically, in May and June 2023, Fredrickson visited plaintiff in RHU on multiple occasions to assess him for injuries and offer care after he reported experiencing seizures. She also repeatedly tried to educate and persuade him to comply with his actual, prescribed medical treatment. Finally, when plaintiff repeatedly refused prescribed treatment and continued to deteriorate, Fredrickson advocated for him to be further evaluated and for more intensive treatment, including being transferred to the DOC's infirmary

Ultimately, plaintiff does not dispute the medical records or Fredrickson's treatment. Nor does he submit any evidence, including his own statements or expert opinions, necessary to raise a material dispute about whether Fredrickson's treatment decisions fell below any reasonable standard of care for a nurse clinician. Accordingly, Fredrickson is entitled to summary judgment on plaintiff's Eighth Amendment and medical negligence claims against her as well.

## II. Conditions of Confinement Claim

This leaves plaintiff's conditions of confinement claim against the security staff defendants. Under the Eighth Amendment, prisoners are guaranteed humane conditions of confinement for their health and safety. *See Rice ex rel. Rice v. Corr. Med. Serv's*, 675 F.3d 650, 664 (7th Cir. 2012) ("Incarcerated persons are entitled to confinement under humane conditions which provide for their 'basic human needs.'"). Plaintiff claims that the security defendants knowingly exposed him to unconstitutional conditions of confinement when they placed him in an RHU cell for medical observation without determining whether the water service in that designated dry cell had been turned on to the sink and toilet.

However, the evidence offered in support of this claim also falls well short of that required to proceed. First, it is not enough for plaintiff to argue that the officers *should have* checked the water before he was moved into his cell. *See Turbin v. Cnty. of Wood*, 226 F.3 525, 529 (7th Cir. 2000) ("[A] prison official does not violate the Eighth Amendment when he should have been aware of a risk that harm would befall an inmate but was not actually subjectively aware of that risk.") Second, plaintiff has submitted *no* evidence showing that any of the security defendants *actually knew* his cell's water was off when he was transferred into it.

Instead, the undisputed timeline set forth in plaintiff's own brief establishes that security staff was *not* notified about the water situation until contacted by HSU the next morning, on May 23, 2023, *after* Sheppard had already moved into the cell. (Dkt. #68, at 14). Third, security staff fixed the water problem as soon as they were aware of it, meaning at worst, plaintiff lacked access to water for some twelve hours, which is simply not long enough to support a finding of an Eighth Amendment violation. *See, e.g. White v. Knight*, 710 Fed. Appx. 260, 261–62 (7th Cir. 2018) (though "long-term deprivations of modern toilet facilities" can potentially violate the Eighth Amendment, "temporary imposition[s]" do not); *Hernandez v. Battaglia*, 673 F. Supp. 2d 673, 676–77 (N.D. Ill. 2009) (collecting cases and finding that not being given water or being allowed to use the bathroom during a ten-hour shakedown did not violate the Eighth Amendment). On this record, no reasonable jury could find an Eighth Amendment violation.

ORDER

IT IS ORDERED that:

1. Plaintiff Charles Sheppard's stipulation for partial dismissal (dkt. #59) is GRANTED, and Mark Ledesma, Gina Buono and Matthew Wright are DISMISSED as defendants.

2. Defendants' motion for summary judgment (dkt. #30) is GRANTED.

3. The clerk of court is directed to enter judgment for defendants and close this case.

Entered this 19th day of October, 2026.

BY THE COURT:

/s/

WILLIAM M. CONLEY
District Judge